REDDIN, APPELLANT, v. DUNN, APPELLEE.

1. FRAUD.
A conveyance obtained fraudulently and deeds executed by the conspirators in furtherance of the fraud will be canceled at the suit of the party defrauded, and this result will not be prevented by a voluntary conveyance by the conspirators to one who had no actual knowledge of the fraud.

2. CONSTRUCTIVE NOTICE.
A knowledge of facts sufficient to put a prudent person upon inquiry, is constructive notice of all facts which might have been ascertained by such inquiry or investigation.

*Appeal from the District Court of Arapahoe County.*

ON the 1st of January, 1889, Sarah Dunn (appellee) was the owner of a tract of land adjoining the town of Yuma, Washington county, a part of which had been subdivided into lots, some of which had been sold. It appears that she was addicted to drinking, becoming intoxicated at times, whenever a favorable opportunity offered. Knowing this fact, one James W. Brown, who kept a house of ill fame, on the evening of January 3, 1889, at 7 or 8 o'clock, with a woman claiming to be his wife, visited Mrs. Dunn, the Brown woman carrying with her a bottle of whisky and a box of cigars. The three, at least ostensibly, started in to have a

good time, and destroy the contents of the bottle; Mrs.
Dunn, with an appetite that needed no prompting, but nev-
ertheless being prompted by the benevolence of the Brown
female.   When the absorption of the fluid was generously
and satisfactorily under way, Mr. Brown left the house,
leaving the woman to manipulate Mrs. Dunn, if any ma-
nipulation was necessary.   Some time during the evening
Brown returned, and with him Granville E. Pendleton, said
to be an attorney at law, who had formerly been consulted
by Mrs. Dunn in regard to her legal matters.   Mr. Brown
informed her of some threatened lawsuit that might endan-
ger her title to her land.   Mrs. Dunn spoke of a suit in re-
gard to a sewing machine, also to be brought, and desired
Pendleton to defend her.   Mr. Pendleton advised that she
" put the land out of her hands " until the lawsuits were
over, assuring her that Brown and he would see that she was
not beaten out of it.   Brown and Pendleton, finding matters
working satisfactorily, left about 10 o'clock, and went up
town.   Some time after, same evening or night, they returned,
bringing with them one Hampton, a notary public.   A war-
ranty deed was presented to Mrs. Dunn, which was by her
executed, conveying all her land, including town lots, to
the man Brown.   It is not claimed that any consideration
passed.   Subsequently, Mrs. Dunn, having recovered from
her debauch, became alarmed in regard to what she had done;
also threatened the parties connected with the conveyance
with criminal prosecution.   Thereupon, to adjust the mat-
ter, Pendleton drew up the following paper: " This agree-
ment, made this 8th day of January, 1889, by and between
James W. Brown and Sarah Dunn, of the town of Yuma,
Washington county, Colorado, witnesseth, that whereas,
James W. Brown has bought certain real estate of Sarah
Dunn adjoining the town of Yuma, Colorado, [description
of property :]   Now, the said Brown agrees to hold said land
under the deed which he has, and he agrees to sell such lots
as he can, and keep a just and true account of all such sales
and amounts derived therefrom, and to properly account for

the same from time to time, as occasion may require; and it is further agreed that any time when these parties to this agreement shall agree among themselves to make out any new deeds to or for this land, that the same can be done at such time as these parties may agree upon, and on any such terms as may be satisfactory to themselves. It is further agreed that a just and proper account shall be kept of all sums of money that may be paid by the said James W. Brown to the said Sarah Dunn, or her order; and the same● is to be properly accredited to the proper party. James W. Brown agrees to keep, fulfill, and perform all the agreements that he has made herein regarding the property in question, and to make such settlements, from time to time, as may be proper and satisfactory to the parties to this agreement. Given under our hands this 8th day of January, 1889, at Yuma, Colorado. [Signed] JAMES W. BROWN. [Signed] SARAH DUNN. Witness: ROSA TOTTEN." It also appears that there was one John M. Abbott residing in the same town, claiming to be an attorney at law, who prior to and at the time was the legal and confidential adviser of Mrs. Dunn, in whom she had full confidence. Him, it appears, the parties Brown and Pendleton found it necessary to placate in order to carry out their plans. He appears to have taken kindly to it, and to have been readily placated. There was also one John H. Reddin, claiming to be an attorney at law, who claimed to have some rights against the land of Mrs. Dunn, which he had been trying to, or threatened to, enforce. His acquiescence and co-operation became important, and he was initiated. These preliminaries having been successfully arranged, on the 12th day of January, nine days after the execution of the deed by Dunn, and four days after the execution of the contract, Brown, Pendleton, Abbott, and John H. Reddin met, and proceeded to distribute and administer the real estate of Sarah Dunn. A number of lots were conveyed by Brown to Abbott, a number by Brown to Nancy E. Pendleton, wife of G. E. Pendleton, and the balance to John H. Reddin; and on the same date, and at the same

time, John H. Reddin conveyed to William G. Reddin the property conveyed to him (John H. Reddin) by Brown. Pending these transactions, and while details were being arranged, it appears G. E. Pendleton and Brown entered upon some negotiations in regard to the residence, furniture, piano, etc., of Brown, which transaction culminated at the same time Brown concluded his conveyance of the Dunn property, by which Nancy E. Pendleton succeeded to the estate, real and personal, of Brown in the town of Yuma, and Mr. Brown, Mrs. Brown, the dispenser of cigars and whisky, and the "maid servants" who assisted in occupying the house, precipitately left the country. In all these transactions it is not claimed, nor attempted to be shown, nor is there any pretense, that any consideration whatever passed, except as between John H. Reddin and Brown. John H. Reddin paid Brown, cash, $1,250; claims to have been an innocent purchaser for value, and poses as a victim. Abbott and Pendleton do not claim to have paid for the property conveyed to them, respectively, but claim that they had earned it as "commissions" in the transactions. After the parties had got through with the distribution of Mrs. Dunn's estate, she conveyed an interest in it to one John Whitly, or, rather, to her attorneys, who conveyed to Whitly. Dunn and Whitly brought suit against the various parties, asking that the conveyance of Mrs. Dunn to Brown, and from Brown to his various grantees, be canceled, and all the transactions pertaining to the property be declared void. William G. Reddin was the only defendant that answered. He did so at great length, traversing the allegations of the complaint relating to himself, claiming to be an innocent purchaser for a valuable consideration, etc. An extended trial was had to the court, resulting in a finding and decree for the plaintiffs that each and every of the deeds were void, and awarding judgment for costs, from which judgment and decree an appeal was taken to this court.

Mr. JAMES H. BROWN, Mr. ROWE MILTON SMITH and Messrs. REDDIN & O'HANLON, for appellant.

Messrs. SULLIVAN & MAY, for appellee.

REED, J., after stating the facts, delivered the opinion of the court.

Comment upon the character and facts of the case is unnecessary. If a judge had the ability to do justice to it by the use of our language, it would only be misdirected energy. A more marked case of bungling, stupid conspiracy to rob a drunken, ignorant woman, and divide the proceeds, cannot be found in court records. The case of the individual who was traveling from Jerusalem to Jericho, "and fell among thieves, who robbed him, stripped him of his raiment, and departed, leaving him half dead," was mild in comparison. That was not done by members of the legal profession, nor by pretended friends. That transaction appears to have been open and manly, in the ordinary course of business, where hypocrisy, whisky and female influence were not involved. I trust I may be pardoned for discussing that case instead of the one under review, as it is a more pleasant case. The inequitable distribution of Mrs. Dunn's property is apparent. Each of the parties, except the owner, had a part of it; she alone was left out. It is not shown that she was stripped of her raiment, but her wardrobe may not have been desirable. There is no attempt on the part of the original conspirators at justification, no attempted assertion of legal title to the premises, nor any pretense that a consideration was paid. The pretended contract executed by Brown and Dunn, after Dunn had got sober and realized her situation, is, if possible, more iniquitous than the original transaction, made to pacify her, and prevent exposure until the scheme could be carried out. William G. Reddin, grantee, as pretended, of John H. Reddin, one of the originals, is the only one who saw fit to defend, and is the only appellant. The validity of his title to the land is attempted to be predicated upon the supposed fact that he was an innocent purchaser for value, without notice, and that, as such, he could take, regardless of the

fraud by which his grantor acquired his pretended title. In order to determine this question the court is confronted with a printed abstract of 156 pages, 24 assignments of error, and a brief and argument of appellant's counsel of 62 pages. No briefs or arguments are filed upon the part of appellee. The industry, research, and ability of counsel for appellant in presenting the case are eminently praiseworthy, though perhaps misdirected.

Passing briefly over the earlier contentions of counsel in the argument, we find some 15 pages upon the proposition that there was no sufficient evidence of fraud. Numerous authorities are cited upon the proposition " that fraud cannot be presumed, but must be proved like any other fact." There is no question of the legal correctness of the proposition. In view of the facts, conceded and testified to by the conspirators themselves, the attempted subdivision and distribution of the estate by deed, followed by the immediate absconding of one of the principal actors, an attempt to justify the transaction, and establish the honesty and *bona fides* of it, seems rather an undervaluation of the intelligence of the court to which the argument is presented.

The next proposition sustained by an elaborate brief is to the effect that there was not sufficient evidence to impeach the acknowledgment. This is also misdirected legal energy. That there was no conveyance, no acknowledgment, or any other element of legal conveyance is not only apparent from the undisputed evidence in regard to the circumstances, but is legally and tacitly conceded by the making and execution of the contract of the 8th, in which Dunn, by her supposed friend and legal adviser, Pendleton, is imposed upon again, and made to believe that the former conveyance is abrogated, and she reinstated in her ownership, with Brown as her agent to sell. The making of the contract alone, regardless of other evidence, is sufficient,—a confession of the fraud that had been perpetrated.

The next proposition is that the court erred in decreeing the deed by Dunn to Brown, and from Brown to John H.

Reddin, and from him to appellant, to be canceled, for the reason that Dunn could not rescind, as she had not placed the parties *in statu quo*. I hardly think I should have the patience, or make any attempt, to examine the contention, if counsel had not made it, evidently in good faith, supported it by supposed authorities, and regarded it as tenable. It is not contended that Dunn received anything whatever from any of the parties. It is contended that John H. Reddin had a claim of $1,000 against the divorced husband of Dunn, for legal services, which he hoped to enforce against the property of Mrs. Dunn, and with that intention had an attachment levied upon her property, which proceedings were pending and undetermined at the time of these transactions, and that, after the conveyance by Brown of Mrs. Dunn's property to him, he dismissed his attachment, and lost his lien ; hence Mrs. Dunn could not rescind without placing him *in statu quo* as to that, as the dismissal of the attachment was voluntary, for the supposed benefit to himself and his worthy partners,—a matter in which she in no way participated, or was shown to have had any knowledge. Counsel fail to inform us what Dunn should have done, or was either legally or morally required to do, in the premises. There was no privity between Reddin and Dunn except through Brown. The consideration from Reddin, if any, went to Brown, his grantor, not to Mrs. Dunn. It is also contended that John H. Reddin paid Brown in cash $1,250, with which he absconded, and that Mrs. Dunn could not rescind without returning that money to Reddin. The absurdity of the claim as a legal proposition is so apparent, upon a bare statement of the premises, that the only wonder is that counsel should seriously attempt to maintain it.

This brings us to the consideration of the only important question in the case, which may be very briefly disposed of, viz., whether the Reddins were innocent purchasers for value. John H. was familiar with the property ; had been mixed up in the affairs of the Dunns, husband and wife ; and, at the time of the transactions in question, had an attachment

upon the land for a demand against the husband.  Pendleton appears to have been the active, moving agent throughout the whole affair, and for such participation his wife, at his instance, received quite a number of Dunn's lots; also succeeded to all the tangible estate of Brown when it was thought advisable for him to leave the country.  After he had succeeded in getting Dunn to convey her entire property to Brown, it was necessary to clear off the cloud of John H. Reddin on the title, and find a purchaser.  Pendleton succeeded in doing both by bringing Reddin into the combine upon his own terms of compromise.  To say he was not initiated fully would be to contradict not only his confederates, but all the facts and circumstances of the case.  He was present at the general distribution; took what was left of the estate after the claims of Pendleton and Abbott, complacently christened "commissions," had been satisfied. His presence and participation in the matter at Yuma and Akron were incompatible with his claim of innocence.  If the facts and circumstances stated were not conclusive in regard to his full knowledge of, and complicity in, the fraud, prior to and at the date of the attempted distribution, his immediate reconveyance of the property at the same time and place, and under the circumstances narrated by himself, is sufficient to convict him.  His brother William G. Reddin, a conductor on the Burlington road, was not present; knew nothing about his purchase of the property on that day, or in regard to the property; had some $600 or $700 on deposit with the firm of which John G. was a member. He would see his brother that night; did not wait, but thinking it would suit him, conveyed it, and left the deed for record, with orders to have it sent to William G.  On his return to Denver that evening, saw his brother, and, on the platform at the depot, sold it to him, taking the $600 in the firm, and subsequently the note of William G. for the balance, which had not been paid at the time of the trial. The pretended consideration was $2,300, made up as follows : Claim against the male Dunn, $1,000 (for which he had on

the same day offered to take $500) ; cash paid Brown, $1,250 ; his trip to Yuma and Akron, $50,—aggregate, $2,300. " He only wanted to get out even." To get even he makes the trade *solus ;* gets his brother to ratify his conveyance ; takes $600 cash in place of $1,250 cash paid out, and the Dunn claim, $1,000 ; takes the note of his brother, payable six months after date, for $1,700, without security upon the land or otherwise,—a very peculiar business transaction for a man whose only anxiety was to get out the money he had put in on the same date. The whole case of William G. Reddin rests upon the testimony of his brother John H. William G. was not sworn. The court was justified in disregarding the entire testimony of John H. ; it was utterly unworthy of credit. This disposes of the contention that John H. was an innocent purchaser without notice. It is unnecessary to invoke or apply any principle of law in a case like this. All that is necessary to dispel the illusion is the statement of the universal and undisputed rule in regard to notice. It is not even necessary that the grantee should have actual knowledge of the fraud. " What would be constructive notice * * * may be said to be a knowledge by the purchaser of some facts which would put him upon inquiry, and require him to examine other matters that would generally unfold the true title." 3 Wash. Real. Prop. 328.

In regard to the claim of William G. Reddin, it is only necessary to say that he was not a purchaser at the time of the conveyance. It was not a voluntary conveyance by John H., in which he in no way participated. The transaction lacked other elements indispensable to render it valid,— there was no consideration, delivery, or acceptance of the deed. Subsequent ratification was attempted to be proved by John H., but the testimony was too weak to establish it. So far as appears from the record, William G. was only a passive convenience in the hands of his brother. It is not shown that he ever personally asserted any right or claim whatever. He wisely kept himself from any active participation. The only criticism of him that can be indulged in

is in his allowing the use of his name to assist in the consummation of one of the most deliberate frauds ever brought to the attention of a court. The decree of the court below, canceling all conveyances, and branding the entire transaction with the mark of its true character, was correct, and must be affirmed. Courts of equity do not lend themselves as agents to perpetrate fraud and robbery, or to assist parties in retaining the proceeds.

*Affirmed.*